THE STATE ex rel. ALBERT B. CHANDLER v. EUGENE McQUILLIN, Judge.

In Banc, June 28, 1910.

1. SUSPICION: Affidavit Unnecessary. It is not necessary to swear to a suspicion. Where the movers for an investigation say they suspect fraud and collusion between adversary parties, an oath would not strengthen their suspicion.

2. ———: Collusion Between Nominal Adversaries: To Gain Jurisdiction in Supreme Court: Interveners' Motion to Investigate: Prohibition. Miller had obtained judgment against the Transit Company for $5000, and relator had bought it, and filed a suit in equity against the United Railways Company seeking to hold it liable for its payment. The suit was on behalf of himself and all other creditors similarly situated who might

choose to come in and participate in the litigation. The cause came on to trial and relator's right to payment from the United Railways Company was duly contested. The hearing being ended, the court took the decision under advisement, and while it was being so held relator purchased another judgment for $4000 against the Transit Company, and came into court with an application for leave to amend his petition and add this other judgment to his suit and submit the two judgments on the evidence that had already been taken, and the United Railways Company consenting the amendment was made. Five days after relator had bought the Miller judgment the motion for a new trial and in arrest therein were dismissed, and at that time the appeal therefrom would have been to the Supreme Court. The two judgments, amounting to $9000, came within the appellate jurisdiction of the Supreme Court, but at the time the application to amend was made an appeal from a judgment in the equity suit, on either separately, would have been to the Court of Appeals. Before any decision was delivered in the consolidated equity case, five attorneys filed a motion that an investigation be made, charging that they suspected that the equity suit was not being prosecuted in good faith; that relator and United Railways Company were not actually adversary parties, but in collusion; that the Court of Appeals had held in another like case that the United Railways Company must pay judgments against the Transit Company; that relator and United Railways Company had combined for the purpose of giving them an appeal to the Supreme Court, and to oust the jurisdiction of the Court of Appeals, and that if they succeeded in this the movents might not be able to collect their judgments in a number of other cases if the Supreme Court should take a different view of the law. *Held*, first, that the United Railways Company had a perfect right to use all lawful means to speed a case to the Supreme Court in the hope that said court might take a different view of the law from that taken by the Court of Appeals, and its desire to accomplish that purpose affords a palpable reason for the withdrawal of a motion for a new trial in the Miller case and for its consent to allow relator to amend his petition in the equity suit and add the second judgment, thereby expediting that suit, and while there was an interested motive on the company's part there was no fraud in it; *second*, the fact that relator applied to amend by adding the second judgment for $4000, and that the company consented, affords no ground to suspect fraud on the part of either, if he was the bona fide owner of the judgments, and he so stated under oath in his reply to the motion and that oath is not controverted by any fact, for the agreement was in the interest both of the relator and of the com-

pany; *third*, the trial court had no jurisdiction to sustain the motion and proceed with the investigation, and a writ of prohibition issues.

*Held*, by LAMM, J., dissenting, *first*, that when suggestions are made by reputable attorneys impeaching the good faith of a pending action for that it is conducted for the ulterior purpose of affecting other real litigation, or has substantial earmarks of being in other respects a feigned suit, a judicial duty arises to investigate, and the court's discretion in such case should not be interfered with by prohibition; and, *second*, the facts in this case justified the court in ordering an investigation.

3. ————: ————: **Observations of Judge.** If the judge trying a charge of collusion against a plaintiff with defendant intends to take into consideration his observations of the conduct of attorneys for defendant and what the clerk told him concerning inquiries made by them, he should notify the accused party and give him an opportunity to meet that phase of the case.

4. **COLLUSION OF PARTIES: Investigation.** The circuit court has jurisdiction, when a proper showing is made, to investigate the question of good faith in the prosecution of a cause pending before it; but it exceeds its jurisdiction when it requires one to answer a bill of impeachment founded on mere suspicion, tying one's hands from prosecuting a suit, and placing upon one a stigma.

## Prohibition.

WRIT AWARDED.

*Jos. S. Laurie* for relator.

*Wm. R. Gentry* for respondent.

VALLIANT, J.—This is an application for a writ to be addressed to respondent, judge of the circuit court of the city of St. Louis, to prohibit him entertaining jurisdiction of a matter pending in his court.

The facts are substantially as follows:

Chandler, the relator, bought a $5000 judgment against the Transit Company, which is referred to in the pleadings as the Miller judgment, and filed a suit

in equity against the United Railways Company seeking to hold it liable for the payment of his judgment. The suit was in behalf of himself and all other creditors similarly situated who might choose to come in and participate in the litigation. The cause. came on for trial and the plaintiff's claim for relief against the United Railways Company was duly contested. When the hearing was ended the court took the decision under advisement, and while it was so held the plaintiff purchased another judgment against the Transit Company and came into court with an application for leave to amend his petition and add this other judgment to his suit and submit the two judgments on the evidence that had already been taken. The United Railways Company consented that it might be done and the amendment was accordingly made. The second judgment was for $4000, therefore the two judgments amounted to $9000, and came within the appellate jurisdiction of this court. Then while the cause was held under advisement certain members of the bar, not connected with the case, came into court and filed a paper saying in effect that they held a number of judgments against the Transit Company for which they were also seeking to hold the United Railways liable, that the St. Louis Court of Appeals had recently rendered a decision in a like case, within its jurisdiction, which is referred to in the briefs as the Barrie case, holding that company liable, but, if Chandler was allowed to go on, an appeal in his case would go to the Supreme Court, and thus the Court of Appeals would be deprived of its jurisdiction, and (inferentially) the gentlemen moving in this matter might not be able to collect their judgments if the Supreme Court should take a different view of the law from that taken by the Court of Appeals, and hence their interest in the matter. Then they went on to say that they suspected that Chandler was not prosecuting his suit in good faith, but had combined

with the United Railways to give them an appeal to this court; they state certain facts which they say are suspicious, to-wit, that after Chandler had purchased his first judgment the Transit Company withdrew its motion for a new trial and in arrest, and after he had filed his suit in equity the parties to that suit by agreement had it transferred to Division 4, where the Barrie suit was pending, and endeavored to have it consolidated with that suit, but failed; that as to the second judgment which Chandler bought there had not been an assignment on the record when the amendment was made, that the amendment was made after the law was passed raising the jurisdiction of the Court of Appeals to $7500; they state that they believe that Chandler's claim of ownership is fraudulent in order to oust the jurisdiction of the Court of Appeals. The paper concludes with a "wherefore, because of the peculiar and suspicious nature of the proceedings," the case ought to be investigated with a view to dismissing Chandler's suit. The paper was signed but not sworn to. Mr. Chandler, on being cited to appear, filed his return under oath averring that he bought the judgments in good faith, paid his money for them and was absolute owner of the same, and denying positively the charge of collusion with the United Railways Company, but averring that he was prosecuting his suit in good faith with confidence of success in this court; admits that the amendment, adding the second judgment, was made with the consent of the United Railways, but denies that his motive in doing so was to enable that company to avoid the Court of Appeals, although that effect would follow. There was no reply to this return, but the court took the matter up, called Mr. Chandler to the witness stand and asked him four questions, in answer to which he stated that he knew the condition of the docket of the Court of Appeals and that of the Supreme Court, that an appeal could be heard in the Court of Appeals in about eight months,

but that it would be about two years before it could be reached in the Supreme Court; then the trial judge said that was all he cared to hear, and made the order for an investigation.

In his return to the rule to show cause why a writ of prohibition should not issue, the respondent states not only what the record of his court shows and what occurred at the hearing, but he also goes on to make statements that are in the nature of original testimony in this court, that is, he says that he noticed that while the matter was pending before him certain members of the bar, whom he recognized as attorneys for the United Railways Company, were in court and seemed to be taking an interest in the proceedings, and that the clerk of the court informed him that one of these gentlemen had made inquiries of him as to what was being done in the matter, and he also stated that his "suspicions were strengthened" by the appearance and manner of Chandler when he was answering the questions the court put to him. The respondent also said that his long experience as a practicing attorney and a judge of the court had shown him that the Transit Company and the United Railways Company usually contested all judgments against them to the highest courts, and the fact that the Transit Company withdrew its motion for a new trial and in arrest in the case when Chandler bought the judgment was a suspicious circumstance.

The result of the proceeding is that on a mere suspicion Mr. Chandler's suit is delayed and the gentlemen entertaining the suspicions are left free to go on with their suits under the decision of the Court of Appeals in the Barrie case, and this too in the face of the only sworn statement in the case, that is, the statement of Chandler under oath that he was the bona fide owner of the judgments and was prosecuting them in good faith. How long Mr. Chandler's hand would be tied by this investigation proceeding there

was no promise; maybe for months, maybe for years, long enough, however, apparently, to accomplish all that the movers in the matter desired. The paper was not sworn to, but it is suggested that in open court they offered to swear to it and the court said it was unnecessary. It was unnecessary: because, except as to facts shown by the record, the papers stated only that the movers suspected fraud; it is not necessary to swear to a mere suspicion. A jurat would not have made it any stronger. The paper did not state that Chandler did not really own the judgments, but that the signers suspected that he did not.

Now, let us take the facts that appear in the record, and see what ground there is for suspicion. That the United Railways Company was anxious to get a case into this court as soon as possible is very probable. A decision of the Court of Appeals had been rendered adverse to the United Railways Company and there were a large number of cases within the jurisdiction of that court which would come under the law as laid down by that court. The United Railways had a perfect right to use all lawful means to speed a case to this court in the hope that this court might take a different view of the law from that taken by the Court of Appeals, and its desire to accomplish that purpose affords a palpable reason for the withdrawal of the motion for a new trial and in arrest in the first judgment bought by Chandler and also for its consent to allow him to amend his equity suit and add the second judgment. It was to the interest of the United Railways Company that the motions for new trial and in arrest should be withdrawn so as to expedite the equity suit which it had every reason to believe would follow, as numerous other cases of like character had taken that course. At the time the motions for new trial and in arrest were withdrawn the Supreme Court had jurisdiction of a cause involving

the amount of that judgment, $5000, therefore it is plain that the withdrawing of these motions were to the interest of the United Railways, for it hastened the next step that the company had every reason to believe would be taken by Chandler, that is, the institution of the equity suit.   But while that cause was held under advisement by the circuit judge, the jurisdiction of the Court of Appeals was raised to $7500, and it then became the interest of the United Railways Company to consent to allow the amendment to be made adding the additional judgment, raising the amount in dispute to $9000.   The United Railways Company had already made all the defense it could make and had prepared the case for an appeal to the Supreme Court; it lost in allowing the second judgment to be added nothing but the delay it could have caused, and it gained what it desired, that is, a condition of the case by which it could go to the Supreme Court.   Conceding that the United Railways looks out for its own interest and interposes motions for delay when it sees fit to do so, it may withdraw such motions when it thinks it to its interest to do so.   There was nothing to be gained but delay by the motions for new trial and in arrest in the Miller judgment against the Transit Company; the vital question was to come in the equity suit, in which the plaintiff in that judgment would seek to hold the United Railways liable, and doubtless that company thought it would be to its interest to advance the equity suit as quickly as possible in view of the decision of the Court of Appeals.   Therefore, we see an interested motive in the United Railways Company for doing what the record in the cases shows it did do, but there was no fraud in it.   The United Railways Company had as much right to conduct its litigation with the aim to get its case into the Supreme Court as quickly as possible as did the gentlemen moving in this matter to block its way to this court, as long as no fraudulent means were used.

The only fact mentioned in this record on which a charge of fraud could be founded, or a suspicion of fraud justly arise, is in reference to the ownership of these judgments. If, as insinuated, the judgments really belong to the United Railways Company, and Chandler is only pretending to be the owner in order to aid the Railways Company in its scheme to get a moot case before this court, then the case calls into action that power which every court of record has to protect its jurisdiction from imposition. But if on the other hand the judgments belong to Chandler, there is not an act stated in the return of the respondent that justifies the imputation of fraud. On the point of owership Chandler swears positively that he is the bona fide owner and there is not a scintilla of evidence to the contrary.

There is no ground to suspect fraud on the part of Mr. Chandler, on account of his agreement with the United Railways Company in relation to the amendment. It often happens in the progress of a lawsuit that antagonistic parties make concessions to each other where there is an exchange of concessions or where it is to the mutual interest of both. It is true Mr. Chandler might have taken his appeal to the St. Louis Court of Appeals, if the decree in the equity case on his $5000 judgment had been against him, but it is also true that he would have been compelled to institute another equity suit on his $4000 judgment, and would have had that litigation all to go over again, but by uniting the two judgments in one that burden and expense were obviated. What he gave up was the prospect of carrying his cause to the Court of Appeals, which, had already spoken on the question; what he yielded to his adversary was the right to go to the Supreme Court, which had not yet spoken, and what he gained was the obviating of the labor and expense of another lawsuit. There is no suggestion that he did not prosecute his equity suit in the circuit court with

all the force he could use or that the United Railways did not resist it with all its power. Here was a case of mutual concessions between the two adversary parties dealing at arm's length with each other. What Mr. Chandler yielded was the prospect of getting a favorable decision in the Court of Appeals before a possible adverse ruling on a like question in this court. What the movers in this proceeding would gain by it is the delay they would cause the United Railways in getting a case into this court where there might be an overruling of the decision on which they rely, until they can collect their judgments against the Transit Company. Chandler in his return under oath says that when he amended his equity suit he had no doubt of the correctness of the Court of Appeals decision and absolute confidence that this court would decide the law in the same way.

There is nothing in the record facts of this case that is not entirely consistent with good faith on the part of Mr. Chandler. As to the ownership of the judgments we have nothing but the sworn statement of Mr. Chandler on that subject, against which there is nothing but a bare suspicion of these movers, prompted possibly by a fear of having a decision on which they rely overruled before they have realized a full benefit of it.

Respondent in his return says that he noticed certain members of the bar in the court room while this matter was on hearing whom he recognized as attorneys for the United Railways, and they seemed interested in the proceedings, and that the clerk of the court informed respondent that one of these gentlemen inquired of him what had been done, and also that respondent in his long experience at the bar and on the bench had noticed a disposition on the part of the United Railways Company to contest every point in its cases, etc. If the respondent trying the question as judge intended to take into consideration his

own observations of parties other than the party accused and what the clerk told him, he should have notified the party and have given him an opportunity to meet that phase of the case.   There is no question but that the United Railways Company was interested in the matter and nothing more natural than that its attorneys should be interested spectators at the trial which might result in blocking the company's way to the Supreme Court until all the judgments against the Transit Company under $7500 could be satisfied.   But that is a matter in which Mr. Chandler was not interested, and it casts no suspicion on him.

Respondent in his return says his suspicions were "further strengthened" by the manner and conduct of Mr. Chandler when he was questioning him.   There is nothing in this record to show us what his manner and conduct were.   His answers to the questions were straight forward, and unequivocal, and as soon as the four questions were answered the court pronounced its judgment requiring Chandler to answer the bill of impeachment filed by the gentlemen who entertained suspicions, thus tying his hands for the prosecution of his suit and placing a stigma on him.

Whilst a circuit court has jurisdiction when a proper showing is made to investigate the question of good faith in the prosecution of a cause pending before it, yet it exceeds its jurisdiction when it makes an order as in this case founded on nothing but mere suspicion.

The writ of prohibition is awarded.   *Fox, C. J., Gantt, Woodson* and *Graves, JJ.,* concur; *Burgess, J.,* not sitting.   *Lamm, J.,* dissents and files dissenting opinion.

## DISSENTING OPINION.

LAMM, J.—*Prohibition.*   A preliminary rule issued here to show cause.   On return made, relator filed a motion for judgment on the pleadings.   The issue

seeks a review of the pleadings. A synopsis follows:

The petition states that one Miller had a judgment for $5000 against the Transit Company; that relator purchased it and took a transfer; that he then brought a creditor's bill to hold the United Railways Company liable for its payment; that such equity suit was assigned to the division of the circuit court of the city of St. Louis presided over by Judge McQuillin; that evidence was heard and the cause tentatively submitted in February, 1909—final submission to await argument and briefs of counsel after the stenographer's notes were transcribed; that before final submission relator purchased the judgment of one Kubke against Transit Company for $4000, and the same was formally assigned to him; that on June 5, 1909, by leave of court and consent of defendant Railways Company, relator amended his bill to include the Kubke judgment; that the cause was then argued and briefs submitted; that it was fully and fairly tried on both sides and is now *sub judice;* that afterwards, on October, 1909, while said cause was still in the bosom of the court, a motion was filed therein and a notice served on relator, Chandler, citing him to appear and show cause.

The motion made by members of the bar, is set out in full in the petition. The substance of it will do, *viz.,* that movents have good reason to believe and do believe that relator's equity suit is not being conducted as a genuine controversy, but in the interest of defendant Railways Company, and not as a real controversy in good faith. "In the interest of a proper administration of the law" movents ask the court to appoint a friend of the court and such commission or commissioners as the court deems proper to investigate the purchase and ownership of said judgments and the steps and proceedings taken in said case, "to the end that the validity and good faith of the proceedings may be ascertained or the contrary established." Mov-

ents say they are attorneys for litigants holding judgments against Transit Company, and are contending that Railways Company is liable for their payment; that their rights will be jeopardized by a feigned controversy. The motion goes on to recite certain facts which, in the minds of movents indicated a fictitious suit in the interest of defendant, ousting the jurisdiction of the St. Louis Court of Appeals and transferring jurisdiction to the Supreme Court—the said St. Louis Court of Appeals having decided in a case known as the "Barrie case" that Railways Company was responsible for judgments against the Transit Company; that the claim of ownership of the judgments was fraudulent; that they were transferred to Chandler by one Woodward, who in turn had bought them in the interest of Transit Company and Railways Company. The motion concludes as follows: "Wherefore, because of the peculiar and suspicious nature of the proceedings in the aforesaid case of Chandler v. United Railways Company of St. Louis, number 47,423 of this court, we ask that the case be investigated as hereinbefore requested."

Relator next alleges that the motion was not sworn to but was subscribed by five attorneys; that presently relator filed his "return" to said motion verified by affidavits. The "return" is also copied in full in relator's petition, but the substance will do. It avers that the charge that Mr. Chandler is not conducting his suit as a genuine controversy, but is carrying it on in the interest of Railways Company, is false; that the charge that there has not been a bona fide presentation of the law or facts is false. While denying other allegations of the motion, it admits the amendment in the equity suit by including the Kubke judgment had the legal effect to oust the jurisdiction of the St. Louis Court of Appeals. It avers that the charge that Chandler was not the owner of the judgments is untrue. It disavows all knowledge or information on the alleged

relations of Woodward with Transit Company and
Railways Company and avers that it does not concern
him whether said charges are true or false. It affirm-
atively pleads that neither the defendant in said causes
nor anyone else, except relator, has any interest in
said judgments, directly or indirectly, and that if re-
lator be successful, he will collect of defendant the full
amount of the judgments as his exclusive property;
that his suit from the start has been prosecuted at his
own cost and expense, free from the control or direction
of defendant, its attorneys or anyone else, for the sole
object of obtaining a judgment; that his case was pre-
sented to the utmost of his ability, after due prepara-
tion, for the sole purpose of showing the court that
defendant was liable for judgments against Transit
Company; that it was defended vigorously and fair-
ly presented on both sides without collusion between
parties litigant or their attorneys, each aiming to de-
feat the other; that Mr. Gilliam, one of movents, was
the leader and instigator of the motion. The return
then deals with certain negotiations between Gilliam
and relator's attorneys pointing to offers indicating
good faith, and denies any improper motive in amend-
ing his pleading so as to confer jurisdiction on the
Supreme Court in case of an appeal, averring that he
"felt perfectly satisfied in his own mind from most
careful examination of the authorities upon the subject,
that the Supreme Court would, upon appeal, hold the
defendant liable;" that Mr. Gilliam in another case,
number 59,868, now pending in the circuit court of the
city of St. Louis, entitled Johnson v. United Railways
Company, had done the same thing relator was charged
with doing, viz., united eight different judgments aggre-
gating $26,600 — no one of which was sufficient in
amount to make the case appealable to the Supreme
Court; that Railways Company was not cited and made
no "return;" but afterwards the motion of Gilliam
et al. being taken up by respondent, the court sua

*sponte* put relator on the stand and examined him by asking four questions—the answers of relator thereto showing that relator knew the condition of the docket of the St. Louis Court of Appeals and of the Supreme Court, and knew that a case could be reached on appeal in the former in eight months and in the latter in about two years. One of the moving parties then asked leave to examine the witness, Chandler, but the court refused. After argument by Mr. Laurie against and Messrs. Gilliam and Gentry for the motion, the court took time to consider, and subsequently entered the following order:

"It having been suggested to the court by practicing attorneys of this bar and officers of this court that the above entitled cause in which a member of this bar and an officer of this court is plaintiff, is not a real controversy prosecuted in good faith, therefore, in order to ascertain the truth or falsity of the charge, it is ordered by this court that Charles W. Bates, Esq., a member of this bar, be appointed commissioner to investigate and learn the true facts in relation to said matter, and report to this court; said commissioner is hereby empowered to compel the attendance of witnesses and the production of books and papers, administer oaths, examine witnesses, and reduce the examination to writing, and to that end may employ the services of a competent stenographer. Said commissioner shall embrace in his report a finding of facts and said report shall be accompanied with all the evidence taken at the hearing.

"EUGENE McQUILLIN,
"Judge, Division No. 6, Circuit Court,
Eighth Judicial Circuit, State of Missouri."

Presently relator filed a motion to vacate the order on the ground the court had no jurisdiction to make it, exceeded its jurisdiction in making it; that the return of Chandler was conclusive; and that in amending his petition so as to include the Kubke judgment

he exercised a right sanctioned by the court at the time.
It does not appear what disposition was made of the
motion to vacate the order, but it is alleged that Mr.
Bates has accepted the appointment, is ready to pro-
ceed, and but awaits the action of this court on the sug-
gestion for prohibition.   It next alleged that the mo-
tion of Gilliam *et al.* presents no grounds for relief,
is not verified by affidavit, is based merely on the be-
lief and suspicions of the moving parties that the con-
troversy was fictitious; that the return of relator com-
pletely answered the suggestions of the movents, was
conclusive upon the trial court and left no alternative
save to dismiss the motion; that if it be considered
that the return was not conclusive and that movents
had the right to rebut the same, yet they failed to do
so and the return, standing unimpeached, was bind-
ing and left no foundation for any investigation; that
the return to the motion, admitting the amendment by
including the Kubke judgment, did not render relator
amenable as for contempt of court or create a founda-
tion for an investigation; that relator had a legal right
to make the amendment by consent of counsel and leave
of court, and his conduct cannot be called in question;
that the course of the court's examination of relator at
the hearing of the motion indicated that he thought
it strange that Chandler would subject himself to a
delay of two years in the Supreme Court when his case
could be reached within eight months by the Court of
Appeals; that a ready explanation is that by avoiding
a new suit on the Kubke judgment and the expense
and delay thereof the delay in reaching a hearing in
the Supreme Court was counterbalanced; that the mov-
ing parties seem to think it strange that Chandler,
instead of going to the Court of Appeals where, under
the doctrine of the Barrie case (138 Mo. App. 557), he
had a plain road to a favorable decision, would by
the amendment take the risk of a decision in a forum
where the question was *nova res;* relator suggests that

there was nothing new in the Barrie case; that its doctrine was merely an application of equity principles long established and recognized and relator felt he had no reason to apprehend an adverse decision at our hands; that the order of the trial court made on the hearing of the motion shows on its face it had no jurisdiction; it does not recite that the court acted on facts within its own knowledge or on facts submitted by third parties but on "the bare suggestion" of movents, which suggestions were not based on knowledge but on suspicion; that so acting without jurisdiction said order wrongfully subjected relator to suspicion and humiliation, imposes on him an expense of time and money and deprives him of his rights as a suitor by subjecting him to delay until the investigation be completed.

Wherefore, a writ of prohibition is prayed, etc.

The return of Judge McQuillin is challenged as insufficient, therefore we give it in full, thus:

"Comes now the respondent in the above entitled cause and makes return to the writ of prohibition herein.

"Respondent admits that he is one of the judges of the circuit court of the city of St. Louis, Missouri, sitting in Division No. 6 of said court, as alleged in the petition of relator, and that he was such judge of such division of said court at all the times referred to by the relator in his petition filed herein. That there is pending in said division of said court over which respondent presides, the suit of Albert B. Chandler, plaintiff, v. United Railways Company of St. Louis, defendant, and that said cause has been tried by the court and is now under submission, all the evidence having been heard and the brief of counsel for the respective parties therein having been filed with the court.

"Respondent further admits that after the evidence in said cause was heard, the plaintiff, Albert B. Chandler, by leave of court granted with the consent

of counsel for the United Railways Company, amended his petition in which he had originally sought to recover only upon a judgment for five thousand dollars in favor of Charles A. Miller and wife and assigned to said Albert B. Chandler, so as to include in said petition the judgment of one Augusta Kubke, which had been obtained against the St. Louis Transit Company for four thousand dollars, and which said Chandler alleged had been duly assigned and of which he claimed to be the owner.

"Respondent further admits that while said cause was under submission and before the rendering of any decision therein by the court, there was filed in said division of said circuit court a motion or petition signed by five members of the St. Louis Bar, all of whom were personally known to this respondent, requesting the court to inquire into the good faith of the plaintiff Chandler in the conduct of said cause against the United Railways Company, and respondent says that said petition or motion signed by said attorneys is correctly copied in the petition of relator on file in this case, with the exception of the names of the various attorneys signed to said petition or motion.

"Respondent further says that said petition or motion was signed by the following attorneys, practicing at the St. Louis Bar, to-wit: John A. Gilliam, William R. Gentry, Amos R. Taylor, Earl M. Pirkey and William L. Bohnenkamp.

"Respondent further says that on Friday, the 22d day of October, 1909, at the October term of said circuit court, the relator, Albert B. Chandler, filed in said cause in said division of the circuit court, over which this respondent presides, a return or answer to the petition or motion filed by said above-named attorneys and duly verified by affidavit, and respondent admits that said return of said Chandler in said cause is correctly copied in full in the petition of relator filed herein. Respondent further says that when plaintiff's said

motion was called the counsel for Albert B. Chandler, to-wit, Joseph S. Laurie, Esq., arose and, at first having filed a motion to strike said motion or petition of said attorneys from the files, stated that he would withdraw said motion to strike the same from the files and in lieu thereof file the return in said cause. The said counsel for Albert B. Chandler objected to the court proceeding any further, claiming that because the motion or petition filed by said attorneys was not verified, while the return of the said respondent thereto was verified, the court was precluded from hearing the matter any further. Whereupon all of said counsel who had signed said motion offered to verify the same by their affidavit if the court would grant them leave to do so, but the court thereupon stated to them that it was unnecessary for the motion to be verified. The court of its own motion then called the said Albert B. Chandler to the witness stand, required him to be sworn and proceeds as follows:

[Here follows the examination of Mr. Chandler, the substance of which is correctly set forth in relator's petition. Also a request by movents to have certain witnesses examined which was denied by the court. Also an offer by Mr. Laurie to furnish further affidavits. Also a recital of the fact of oral argument on the motion, a citation of authorities and leave to file briefs, respondent furnishing this court with a memorandum of authorities furnished by attorneys for the motion and on which he acted.]

"Respondent further admits that on the 5th day of November, 1909, it being one of the days of the October term of said court, the respondent, as the judge presiding over said court, made the order referred to in relator's petition and in doing so handed down in open court memorandum in said cause, which is correctly copied on pages 8 and 9 of the petition of relator on file herein, and respondent further admits that on the same day and immediately after said decision

was handed down, Joseph S. Laurie, Esq., as attorney for said Chandler, filed a motion to set aside said order, which motion is correctly copied on page 9 of relator's petition herein.

"The respondent denies each and every other allegation in the petition of relator on file herein.

"Further making return in this case, respondent says that when the motion filed by said attorneys in said cause requesting the appointment of a commissioner to inquire into the question of the good faith of the plaintiff Chandler in bringing and maintaining said suit, was being argued orally before him as judge of said court, on the 22d day of October, 1909, respondent noticed that in the courtroom there were present five or six attorneys for the defendant United Railways Company, although that company was not a party to said proceedings, all of which attorneys are connected with the office of the general counsel for the United Railways Company, and this respondent noticed during the proceedings above referred to that great interest was manifested therein by all of said attoneys for the United Railways Company, and this respondent further states that while he had under consideration the motion which had been argued on said 22d day of October, and before he sustained the same as set forth in relator's petition, he received information from the clerk of said division of said court that one of the attorneys connected with the office of the general counsel for the United Railways Company came to the clerk and made inquiry as to what this respondent had done or was doing in regard to said motion filed by said attorneys as aforesaid.

"This respondent further says that in view of the various allegations contained in the motion filed by said attorneys requesting an inquiry into said cause, particularly the allegations concerning what was shown by the records of the circuit court of the city of St. Louis, and in view of the further fact that this re-

spondent, by reason of long practice at the St. Louis Bar as an attorney, and by reason of his service in said court as judge, had many times noticed that the St. Louis Transit Company and United Railways Company of St. Louis were accustomed to contest to the highest courts to which such suits could be carried all judgments for any substantial sum of money, particularly for so large a sum as five thousand dollars, and in view of the fact that it was shown to him by the motion of said attorneys that the records of the circuit court of the city of St. Louis reveal the fact that while a motion for a new trial and a motion in arrest of judgment in the Miller case were pending and before they had even been ruled upon by the circuit court, the St. Louis Transit Company, through its counsel, voluntarily withdrew said motions, thereby precluding itself from an appeal to the Supreme Court in said cause, although its usual custom was to appeal all such cases, and in view of the information conveyed in the motion filed by said attorneys to the effect that such action on the part of said St. Louis Transit Company in withdrawing said motion at said time occurred only five days after said Miller judgment was assigned to the said Albert B. Chandler, and in view of the information contained in said motion filed by said attorneys, which showed that the said Chandler had apparently by his acts repeatedly sought to avoid every court that had decided in favor of his contention or supposed contention in his case, the court's suspicions were aroused. Respondent's suspicions were further strengthened by the appearance, manner and conduct of said Albert B. Chandler when respondent was questioning him while he was upon the witness stand on said 22d day of October, 1909, on the occasion above referred to, and respondent, while considering said motion, also recalled the fact that the United Railways Company had consented that said Chandler, after the evidence had all been heard in his case against the United Railways

Company, might amend his petition by interlineation by joining another cause of action on a judgment for four thousand dollars, obtained by one Augusta Kubke against the St. Louis Transit Company, thereby raising the amount of the petition to nine thousand dollars and thereby precluding the possibility of his case going to the St. Louis Court of Appeals, which only a short time before such action was taken by him had decided in favor of his contention by affirming the case of Barrie against the United Railways Company, which is reported in 138 Mo. App. This action of the United Railways Company in voluntarily consenting to facilitate a plaintiff in trying a case involving four thousand dollars and dispensing with the whole trial of such a case by simply amending his petition by interlineation and tacking that case onto another suit which had been tried, seemed to respondent so very unusual and contrary to the practice of the said United Railways Company, whose usual practice is to contest vigorously all important claims involving anything like four thousand dollars, that such circumstances further aroused the suspicion of the respondent. All the above-mentioned circumstances, when taken into consideration by the respondent while considering said motion, convinced him that the interest of justice demanded that he should make an investigation as to whether this case was being conducted in good faith, or whether the said Albert B. Chandler and the United Railways Company of St. Louis were acting in concert and not in opposition to each other, in harmony and not engaging in a real controversy in a suit pending before him. Therefore desiring that all cases pending in his court should have a fair and impartial hearing, that the interest of justice might be met, and that litigants should have their rights, and desiring to preserve the dignity of the court over which he presided as such judge, the respondent made the order appointing Charles W. Bates, Esq., commissioner to make an investigation

into the good faith of said cause, as set forth in relator's petition filed herein.

"Respondent further states that by reason of the condition of the matters pending in Division No. 6 of the circuit court, over which he presided at the times mentioned, it was impracticable for him to consume the time necessary to hear the numerous witnesses and take the evidence required, to the end that a thorough judicial investigation of said charge might be made, without neglecting important matters pending before him which demanded immediate attention, and therefore respondent instead of conducting said investigation himself appointed said commissioner to perform the service designated. As a further reason for the selection of said commissioner, respondent respectfully directs the attention of this Honorable Court to the fact that, under the law governing the circuit court of the Eighth Judicial Circuit of Missouri, assignments of the judges of said court are made from time to time, as required by the general term of said court, to the respective divisions of said court; that said court, as at present constituted, consists of twelve divisions, namely, nine civil and three criminal; that Division No. 6 is a civil division of said court; that when the matter above mentioned was pending, this respondent had been assigned by said general term to preside over Division No. 12, to try criminal cases, for a period of eighteen months, his service in said criminal division to commence on the first Monday in January, 1910; that at the times above mentioned the whole time of this respondent was required to be devoted to the numerous cases pending in said civil division, No. 6, so that those partly heard might be completed before said first Monday in January, 1910, and that the entire business of said Division No. 6 might be in reasonably good condition for respondent's successor in said division on said first Monday in January,

229 Sup—35

1910. And this respondent says that in making such order he verily believed, and still believes, that he was proceeding in the proper exercise of his jurisdiction as judge of said court, which jurisdiction was conferred upon him by the Constitution and laws of this State, and he believes that there is no valid reason in law why the rule heretofore made upon him should be made absolute.

"Respondent further states that he is ready and willing at all times to obey the orders and conform to the command of this Honorable Court; that he has proceeded no further in said matter since being served with the writ of prohibition in this case and will proceed no further until permitted so to do by the order of this Honorable Court.

"Wherefore, respondent prays to be hence dismissed with his costs, and that said writ should not be made absolute."

I. A motion for judgment, while not technically a demurrer, has elements common to one—one of them that the issue is at law. Hence, well-pleaded averments of fact in the return are taken as true, if not absurd or impossible—the challenge being to their sufficiency at law.

Counsel radically differ on the scope and purpose of interveners' motion in the equity suit. For relator it is insisted the proceeding looked to his punishment for an indirect criminal contempt, and was, in effect, a contempt proceeding. In that view of it, comment is made on the absence of an affidavit to the motion, its lack of certainty in specific averments of fact, on its dealing with mere suggestions, on the fact that relator was cited to show cause and thereupon made his return on oath fully purging himself of contempt by showing good faith. On such premises, counsel argues that under settled practice in proceedings for constructive contempts of a criminal nature, on relator's purg-

ing return coming in with no countervailing affidavits filed, the end of the row below was reached, and further inquiry was shut off. Therefore, the order looking to further inquiry was without jurisdiction. Contra, respondent's counsel insist that the proceeding was not one in contempt at all. In the contingency the court ultimately found the suit fictitious, he concedes such finding might be the basis of or provoke another proceeding, *viz.*, a formal charge, citation and trial for contempt—but only in case the court of its own motion then determined to take that course. He insists that the primary object and due office of the motion was to incite an inquiry into the facts and to have the suit dismissed if, on such inquiry, the fact be found to be that Railways Company was the beneficial owner of the judgments and (through collusion with relator) as *dominus litis* was prosecuting a feigned suit, not a real controversy—one likely (or intended) to affect the interest of third parties.

On a review of the proceeding below, my conclusion is that it was not one in contempt, *eo nomine* or in fact. This, because: There was no affidavit charging contempt of court made or filed, and no citation to show cause for indirect contempt nor any citation at all, as required by common and statute law, nor was there any hearing as for contempt. To the contrary, the court refused to have interveners' motion verified, refused to allow other affidavits or present examination of witnesses *ore tenus,* entered no judgment discharging or punishing relator, but merely made an interlocutory order looking to an investigation of the bare facts and a presentation of the evidence (not by *ex parte* affidavit, but) by testimony. Relator appeared without any citation or order to show cause and, moving to strike out interveners' motion, voluntarily abandoned his motion to strike out and filed a pleading containing suggestions against making an order of investigation. These suggestions, partly averments of fact and

partly argumentative, were under oath. In effect the answer or so called return was but an *ex parte* affidavit directed to the motion. Relator offered to file others, but the court, as said, concluded to have testimony taken.

To get at the gist of the matter we must gather the purpose of the proceeding from the motion and order. The motion was on behalf of certain parties who insisted their rights as holders of other judgments would be jeopardized by a feigned controversy and they asked the court in the interest of a proper administration of the law to appoint a commissioner to investigate the purchase and ownership of the Miller and Kubke judgments and the steps taken in the equity suit, to the end that its good faith be ascertained. So far the motion went, and stopped with that request. It informed the court of certain facts which, in the minds of movents, indicated a simulated suit intended and calculated to affect their rights in other litigation. Movents were enrolled attorneys, *rectus in curia*. Let it be assumed relator is entitled to the same standing. The court took cognizance of the matter and made an order in terms looking only to an investigation of good faith, the order stopping there. It made no order as in a contempt proceeding, but appointed a commissioner to take testimony, find the facts and report finding and evidence for the use of the court. Whether it had power to make an order to ascertain whether a pending suit involved feigned or a real controversy, at the instigation of third parties whose rights may be affected, we will presently see.

My notion is the proceeding was not a contempt proceeding and therefore the excellent points of learning discussed by learned counsel, distinguishing a proceeding in civil contempt from criminal contempt, and between contempts in equity and at law, are afield.

That under given circumstances it is a punishable contempt to foist upon a court a feigned controversy,

one covinously, *i. e.,* collusively, contrived, whereby its time and the public money (mortgaged to justice) are frittered away, or real and honest litigation by third parties may be affected by a ruling in such case, made up for ulterior purposes only, is true. [Smith v. Railroad, 29 Ind. l. c. 550-1; Lord v. Veazie, 8 How. (U. S.) l. c. 255.]

But there is another result, *viz.,* the dismissal of the suit, as will presently appear, and toward that end the motion and order headed, if the facts, when ascertained, allow. Therefore to apply the learning of the books relating to pleading in contempt cases, as relator seeks to do, is out of place at this stage of the matter. To say that under the pleadings as they stood below the court could not fine or imprison relator for contempt, therefore the court could not investigate to see if the suit should be dismissed, is a palpable *non sequitur.*

II. As I grasp the run of the argument of learned counsel, he contends further that relator was within his clear legal right in amending his pleadings so that the amount in dispute would be large enough to invoke the judgment of this court, in case either he or defendant was put to an appeal in the equity suit; and that the purpose and effect of the motion and order were to deny him the exercise of such clear right, in other words, are hostile to our jurisdiction by showing a friendliness or predisposition to the jurisdiction of our learned brethren of the St. Louis Court of Appeals. The matter is thus put to us somewhat in an *ad hominem* or personal way as if we had occasion to protect the ancient and plenary jurisdiction of this court and keep open the road to appeal here. But should we not be grounded in the belief that no court in this State would be so false to itself as to purpose thwarting or clipping away our jurisdiction or diverting it, regardless of the plain ordinances of the Constitution and

laws? Should we not believe furthermore, that all judges know that chaos and scandal would result if the constitutional orbits of the jurisdiction of courts were not preserved, and if they did not move in them har-moniously? Therefore, we should not be hurried in any case into issuing a writ of prohibition on the theory that such sinister purpose exists *nisi*, unless the facts bear no other reasonable construction, nor should we part, as in a *panic*, with our stock in the belief that *nisi prius* judges are actuated by as exalted motives as the members of this bench. We bear full witness to their fidelity to high ideals in fearless administration of the law. They stand charged, as sentinels, with the primary duty of keeping the stream of justice pure at its source. It is to their honor that they keep faithful watch and ward, and, as I see it, there is nothing in this record tending to show respondent is not alive to his duty and responsibility. What occasion have we to fear that he will dismiss a cause merely because the amount in dispute was made by amendment large enough to give us jurisdiction, or because the issues were made up in a friendly way so long as the controversy is a real and not a feigned one and the suit is not substantially in the control of one of the parties litigant? What occasion is there under his return to say that Judge McQuillin is about to act on the fear we will subvert justice by deciding against equity and good conscience and is seeking to keep from us a case belonging here? None whatever. Doubtless when possessed of the facts, he will rightly determine whether the case is a fictitious one, dominated by one party, brought on judgments owned by defendant, arranged so that his or our decision may injuriously affect the just rights of other litigants, or is an honest fighting lawsuit with two sides, honestly conducted to determine relator's right to a judgment below as well as above.

The case permits further observations, since the writ is a discretionary one. For instance it is not clear how allowing a writ to go would preserve the integrity of our jurisdiction any more than by discharging the preliminary rule and denying the writ. The amount in dispute being within our jurisdiction the case gets here either way. On the one hand, if the writ go and the investigation stop, the case will come here on an appeal if a judgment below follow and an appeal is taken. On the other hand, if the writ is denied and the suit is dismissed presently by respondent because of facts found by the investigation, an appeal lies to this court and any error in such dismissal can be cured. Moreover, if the writ is denied and on investigation the court find in favor of good faith, an appeal lies here from the final judgment, if one is taken on the merits.

The case at this point allows an hypothesis, *viz.*, suppose the writ be awarded, the investigation *nisi* stopped, and on appeal a suggestion is made at our bar by reputable officers of this court, attorneys enrolled here, that the suit is fictitious, for ulterior purposes and with one party as its master, what then? Is it conceivable that we are so poor in power and dead to duty that we cannot or would not investigate so serious a charge? Such right, lodged in this court, is inherent and unquestioned. [See authorities, infra.] If, then, an investigation is proper it should go on where it can be most conveniently made and where justice can be most speedily done. Being tried in the fire of a searching investigation the gold of a bona fide lawsuit will stand out with more luster, if it is there.

III. The main question is: Did the court have jurisdiction to make the order? The exposition of this phase of the matter involves ascertaining whether such order accords with good practice, and whether the condition of things indicated by the motion, order

and the return of respondent justified starting and continuing the investigation. These questions are related and may be disposed of together.

Under our statute (sec. 793) parties are encouraged to submit a case on questions of difference, the subject of a civil action, without suit, on an agreed case containing the facts upon which the controversy depends, provided it is shown to be real and in good faith. We refer to that statute as a recognition of the necessity of a real controversy as contradistinguished from one only seemingly so.

A review of some of the cases will elucidate the point in hand. Thus:

Judson v. Flushing Jockey Club, 36 N. Y. Supp. 126, involved the constitutionality of a law. It came up on appeal to the general term. When reached on the calendar counsel on both sides announced "ready," whereupon members of the bar in behalf of interests not apparent upon the record, but involved in the decision, objected to the argument of the appeal on the ground that the action was fictitious litigation contrived and presented to procure a decision on a question not actually in controversy between real contestants, but framed and propounded by a person who in fact was both plaintiff and defendant. We infer the objection was oral. On that objection it was, by a "per curiam," ruled as follows:

"Courts of judicature are organized only to decide real controversies between actual litigants. When, therefore, it appears, *no matter how nor at what stage,* that a pretended action is not a genuine litigation over a contested right between opposing parties, but is merely the proffer of a simulated issue by a person dominating both sides of the record, the court, from a sense of its own dignity, as well as from regard to the public interests, will decline a determination of the fabricated case so fraudulently imposed upon it.

"If we may not accept the assurance of reputable members of the bar as proof that the action is a false and fictitious litigation, their statement suffices, at all events, for a postponement of the decision until the court shall be satisfied that it has to do with a legitimate forensic discussion. *According to the precedents, we may so ascertain either by the record, by affidavits, or by a reference.* The last-named expedient we adopt as the more effective method of investigation."

Subsequently, on the report of the referee coming in that the controversy was fictitious, the suit was dismissed. [*Ibid,* p. 128.]

Lord v. Veazie, 8 How. U. S. 251, was pending in the Supreme Court of the United States on a writ of error from the circuit court for the district of Maine. Mr. Moor, counsel for a bank not a party, moved to dismiss because the case was a fictitious one got up between the parties to settle legal questions upon which his client had a large amount of property depending. Documents and affidavits were filed in support of the motion. The principal affidavit by Moor stated "his *belief*" that the case was feigned and intended to affect his, Moor's, rights. Affidavits were filed against the motion. It was ruled that the proceeding was fictitious and the judgment would not support a writ of error. Accordingly, it was dismissed, the order of dismissal in part reading:

"This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Maine, and was argued by counsel, and it appearing to the court here, from the affidavit and other evidence filed in the case by Mr, Moor, in behalf of third persons not parties to this suit, that there is no real dispute between the plaintiff and defendant in this suit, but, on the contrary, that their interest is one and the same, and is adverse to the interests of the persons aforesaid, it is the opinion of this court, that the judgment of the circuit court

entered *pro forma* in this case is a nullity and void, and that no writ of error will lie upon it.''

In leading up to such order Chief Justice TANEY pointed out the distinction between the conduct of a suit in an amicable manner without the parties embarrassing each other with unnecessary forms or technicalities and by admitting facts known to be true without proof, expense or delay, where there are real adverse interests and where the amity consists in the manner in which the suit is brought to issue before the court (which amicable actions are approved and encouraged by courts because they facilitate the administration of justice), and those suits that are fictitious in fact, conducted by persons who have no real conflict in interest and whose common interest is adverse to and in conflict with the interests of third persons having rights seriously affected, if the question of law be decided in the manner both parties desire it to be.

In another case in the same court, Dubuque and Pacific Railroad Co. v. Litchfield, 23 How., 66, Jeremiah S. Black, then Attorney-General, intervened on behalf of the Government suggesting the suit was a fictitious one to construe a grant of land contrary to a prior executive construction. We do not find there were any pleadings or affidavits filed by Mr. Black. He filed a brief raising the point and relied on the facts disclosed by the record. His suggestions were denominated by Mr. Justice CATRON as an ''*imputation* of contrivance.'' The parties to the litigation and their counsel thereupon filed affidavits and statements. The court, while ruling against the point of the Attorney-General, took cognizance of the matter and passed upon the good faith of the litigation.

In Wood-Paper Co. v. Heft, 8 Wall. (U. S.) 333, a motion was interposed on appeal by Mr. Meach. He asked leave to intervene on an allegation that since the decree below the case had been settled and was

now being carried on without appellee having any interest in the defense and to obtain a decree above in favor of complainants in order to influence other suits pending below in their favor against strangers to the suit, and in which the same questions were involved, in one of which suits intervener was a defendant. The application of Meach was allowed and a commission issued to take proofs in the matter. On these proofs coming in a motion to dismiss was argued and the suit dismissed—the court commenting on the fact that complainants had purchased certain patents under which the suits were being defended and now owned both sides of the litigation.

Cleveland v. Chamberlain, 1 Black 419, was in the same court on appeal. A railroad company, through Jeremiah S. Black, filed affidavits and asked that the case be dismissed on the ground that Chamberlain was the only party on the record who had an interest in the cause either way, that he was conducting the appeal on both sides, and that other parties, not named in the record, would suffer by the decree which he might thus procure to be made. It appearing that Chamberlain had bought the debt demanded by Cleveland in his bill, after the decree, and was carrying on a pretended controversy on a record made up below to obtain a decision injurious to the rights and interests of third parties, the cause was dismissed. It was held that any attempt by a mere colorable dispute to obtain the opinion of the court upon a question of law, which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as the adverse parties to the suit was an abuse which courts of justice have always reprehended.

In Ward v. Alsup, 100 Tenn. l. c. 743, it was held that "a suit may be shown to be fictitious by the record, or by evidence *aliunde,* or both. . . . Or upon affidavits of third persons. . . . Or the case

may be referred to the clerk for proof"—citing authorities for each proposition. The case was an appeal from the chancery court of Shelby county. In the Supreme Court a motion was filed by "reputable attorneys," *amici curiae,* to dismiss because it was a sham action colorably instituted to obtain a decision on a feigned issue for the purpose of determining a question of law which may affect other parties not impleaded who are litigating similar questions in another court. In ruling on that motion and the counter-affidavits filed it was determined that the bill had been properly dismissed below because of matters appearing on the face of the record. Therefore, there was no necessity for dismissing the suit on the motion of the *amici curiae.* But such motion was considered fully by SNODGRASS, Chief Justice, and many cases reviewed, he concluding as follows:

"Where a sharp issue is presented to this court, by reputable attorneys on both sides, as to whether or not suits are brought in good faith, or for an ulterior purpose of affecting pending litigation between other parties, this court would not proceed to a hearing of the merits, until the preliminary question is fully investigated and determined."

In Haley v. Bank, 21 Nev. 127, the question is adjudged on principle and authority. In that case a motion was filed below by an officer of the court as *amicus curiae* (presumably an attorney) to dismiss the action and he tendered affidavits in support. The court permitted the motion. Plaintiff denied the right of counsel to make the motion and excepted to the ruling. At the hearing, by a stipulation, affidavits filed in another interlocutory step in the case were read as evidence so far as pertinent. On appeal it was ruled that a motion of this sort was in the nature of suggestions to the court that the action was not real but fictitious. "When," said MURPHY, J., "actions are brought in a court of law, a duty devolves upon

the judge, and that is, scrupulously to guard its proceedings from being used by the parties collusively, and not suffer a judgment to be entered without being fully satisfied that a cause of action really exists, as provided for by law.

"Whenever facts are placed before a court, which cause any suspicion that there is any collusion between the parties, *no matter in what way or form the facts are brought to the knowledge of the court,* it is the duty of the judge at once to institute such an examination as will satisfy him of the truth or falsity of the charge." Commenting on certain circumstances and facts, they were characterized as giving "a strange appearance to the mode in which this action was commenced and has been prosecuted, sufficient, in our opinion, to sustain the order of dismissal." It having been argued that Baker had no right to make the motion, the court ruled on that argument as follows:

"It is not only the right, but the duty, of an attorney of the court, if he knows *or has reason to believe* that the time of the court is being taken up by the trial of a feigned issue, to so inform the judge thereof; and it is discretionary with the court to stay proceedings, make due inquiry, and, if the facts warrant the suggestion, then dismiss the case."

In cases collected by Roger Comberbach, Esq., argued and adjudged in the Court of King's Bench from the fifth year of King James II. to the tenth year of King William III., we find the case of Brewster v. Kitchin (Comb. 1. c. 425). In that case Lord Chief Justice HOLT directed the tart inquiry to counsel: "Do you bring *fob* actions to learn the opinion of the court?"

In re Elsam, 3 Barn. and Cress. 597, the court moved in an examination on "a doubt occurring whether the transaction were bona fide." A master having been appointed in that case to inquire of cer-

tain facts his report showed the fictitious character of the suit of Fox v. Dodds.

In other cases the court has adopted the plan of passing a rule requiring the party charged with maintaining a fictitious suit to purge himself by an affidavit showing good faith under pain and penalty of having his case dismissed. [The People ex rel. v. Leland, 40 Ill. 118; Ebert v. Beedy, 113 Ill. 316.]

It has been ruled that on an "appearance" that the case is fictitious, an investigation will be set on foot and a showing required—e. g., in People ex rel. v. Leland, supra, the order merely recited as ground for an examination that, "This has the appearance of a fictitious case."

In other cases it has been ruled that a judgment obtained collusively is inoperative. [Girdlestone v. Aquarium Co., 3 Ex. Div. 137.]

On an appeal in which we cannot find the point was made by counsel, but the fact was disclosed to the appellate court by inspecting the record (Meeker v. Straat, 38 Mo. App. 239), ROMBAUER, P. J., said:

"This decree cannot stand. Suits contemplate adversary parties, although amicable suits may be brought to determine the respective rights of the parties thereto. When a suit is brought with a view of affecting the rights of third parties, and it is apparent that that is its sole object, the suit ceases to be adversary and becomes collusive. No court should lend its aid to such a proceeding, least of all a court of equity."

We are not cited to any case in this court where the precise question was in judgment. But we have ruled that where an appellant had paid the judgment, or discharged a joint tortfeasor by accepting satisfaction from him, or had accepted an award which had the legal effect of settlement, so there is no longer a real controversy, the issue was "killed" for appellate purposes, and we would proceed no further with the

case. See authorities collected by GANTT, C. J., in Cape Girardeau and Thebes Br. Term. R. R. Co. v. Southern Ill. and Mo. Br. Co., 215 Mo. l. c. 296 *et seq.*

From these cases the following propositions are deduced:

(a). When suggestions are made either below, or on appeal, by reputable attorneys impugning the good faith of an action for that it is conducted for the ulterior purpose of affecting other real litigation, or has substantial earmarks of being in any other respect a feigned suit, then a judicial duty arises to investigate.

(b). The form or the time of the suggestions is not of substance, so long as they come from a reputable source and are in time to effect a remedy, should an investigation call for one.

(c). So, the court, *sua sponte,* at any time while a case is in the bosom of the law (*in gremio legis*), from facts appearing in its history may order an examination into its good faith—this, without the intervention of attorneys, *amici curiae*, or otherwise.

(d). The suggestions possibly may be made orally at the bar, certainly by briefs. But the better and usual practice is to make them in a writing filed. They may be verified or supported by affidavits, or be verified alone by the honor of counsel making them, or stand on the sanction of the attorneys' oath of office—this, as the court in the exercise of a sound judicial discretion may direct or allow.

(e). The suggestions may be by counsel acting in the interest of third parties whose rights in other litigation are in danger from a made-up and fictitious case, or by counsel acting strictly as friends of the court.

(f). It may be enough to warrant an investigation that the suggestions show the *appearance* of a feigned issue, and the ultimate facts establishing good

faith or the lack of it may await the result of an examination directed by the court.

(g). The facts may be got at by affidavits and counter-affidavits, or by hearing witnesses at the bar, or by a reference to a master or commissioner to take testimony and report—the *method* to be directed by the court as may appear just and proper under the circumstances of the particular case and the condition of the docket.

Obviously the truth might never come out from its secret places if the procedure were to be limited to mere voluntary *ex parte* affidavits. Obviously an enormous delay and burden would be put upon the trial court, interfering with its time mortgaged to other judicial duties, if a hearing *ore tenus* was the only alternative. Obviously a reference to a master or commissioner is in accordance with the usage of courts if that course accords with the good sense of the thing. The maxims are: What is just and right is the law of laws; Custom is the best expounder of the law; The practice of the court is the law of the court (*Cursus curiae est lex curiae*). We had occasion to investigate a kindred matter, to-wit, the appointment of a commissioner to take testimony on a motion for a new trial (Devoy v. Transit Co., 192 Mo. l. c. 221), and refused to rule that the court did not have an inherent right to appoint a commissioner under extraordinary circumstances appealing to his discretion.

Based on such premises, we should rule there was jurisdiction to make the investigation. It would be a dangerous precedent to rule otherwise. For obvious reasons we should not indicate our views on the grounds. It may with propriety be said, in passing, that some of them standing alone would not justify a finding of a feigned suit—for instance, the presence and interest of lawyers for Railways Company and Transit Company at the hearing of the motion, or the

mere fact that by amendment the appeal was headed toward this court. But the suggestions are grave enough in other particulars, taken as a whole, to warrant going to the bottom of the matter to find if defendant Railways Company is the beneficial owner of the judgment and if the suit is being controlled in its interest. The mere fact that relator filed an affidavit and that none was filed on the other side should not, of its own vigor, stop the investigation at that point, under the offer made by counsel to file counter-affidavits and the desire of the court, in the state of its docket, to have a different method of investigation.

I voted for the preliminary rule to show cause. My predilections were in favor of a writ, but my study of the authorities and the very reason of the thing have persuaded me to my present conclusion that the writ should be denied and the preliminary rule discharged. I regret to differ from my learned brethren, but am constrained for the reasons given above to do so.